THE LIBERTY NATIONAL BANK OF KANSAS CITY v. VANDERSLICE-LYNDS COMPANY, Appellant.—95 S. W. (2d) 324.

Division One, April 3, 1936.

*Cooper, Neel, Kemp & Sutherland* and *Charles M. Howell* for The Liberty National Bank of Kansas City.

934

*Lathrop, Crane, Reynolds, Sawyer & Mersereau, John H. Lathrop, Henry W. Fox* and *Claude A. Ferguson* for Vanderslice-Lynds Company.

BRADLEY, C.—Plaintiff brought suit on a check for $18,296.42 issued by defendant. Defendant in its answer, among other defenses, set up a counterclaim against plaintiff. The jury found for defendant on plaintiff's petition and for plaintiff, by direction of the court, on defendant's counterclaim. Motions for new trial were filed and overruled and both parties appealed. Plaintiff's appeal is number 33,037 and defendant's appeal is number 33,036. The separate appeals were consolidated and joint abstract filed.

Plaintiff's petition is conventional. Defendant's answer, except the counterclaim, is a (1) general denial; (2) denial that plaintiff paid anything to the payee named in the check; (3) that the check was obtained from defendant by fraud and was without consideration, and that plaintiff was not a holder in due course; (4) and that the check was paid. Defendant's counterclaim is pleaded as follows:

"Defendant states that on November 17, 1928, Davidson Mill & Elevator Company by J. N. Davidson, made, executed and delivered to H. Lichtig & Company for value a check drawn on Liberty National Bank, plaintiff herein, for the sum of $18,377.42, payable to the order of H. Lichtig & Company, and said payee on the same day duly endorsed and delivered said check for value received to this defendant before maturity thereof, and this defendant on the same day deposited said check in Commerce Trust Company and said check was duly presented to plaintiff for payment within a reasonable time, to-wit, on November 19, 1928, and Commerce Trust Company received credit against plaintiff for the amount of said check in the clearing house and the Federal Reserve Bank of which plaintiff and Commerce Trust Company were members, and said plaintiff retained said check for such length of time and did or omitted to do such acts in reference thereto that plaintiff was obligated

to pay and in fact had paid said check to Commerce Trust Company, for this defendant, and Commerce Trust Company was not obligated to take back or accept a return of said check which it has presented; that thereafter and without defendant's knowledge, the Commerce Trust Company at the instance and request of plaintiff entered into an agreement with plaintiff wherein and whereby Commerce Trust Company paid back to plaintiff the amount said Commerce Trust Company had received or was bound to receive in payment of said check of Davidson Mill & Elevator Company, and said Commerce Trust Company wrongfully caused or induced defendant to furnish to Commerce Trust Company the funds with which to pay back said amount to plaintiff without divulging the facts to defendant, and plaintiff did receive, accept and retain and still retains wrongfully said sum of $18,377.42, and is unjustly enriched in said amount, which said sum is justly due defendant, but which plaintiff has failed and neglected to pay defendant.''

The counterclaim, as stated by defendant, is for money had and received, and judgment is sought against plaintiff for $18,377.42, with interest. Plaintiff's reply to the answer and counterclaim is a general denial.

Defendant is a corporation and deals in grain in Kansas City. J. N. Davidson, operating under the name of Davidson Mill & Elevator Company, was also a grain dealer. Henry Lichtig officed with defendant and dealt in grain under the name of Henry Lichtig & Company. Davidson, a grain dealer for several years, did his banking business with plaintiff, and had for some years. He was well known to both plaintiff and defendant and was regarded by them as trustworthy and reliable. Saturday, November 17, 1928, Davidson, at defendant's office, presented four warehouse receipts showing certain grain sold to Lichtig. The total amount of these receipts was $18,296.42. On these receipts, Davidson received from defendant the check sued on. On the same day that Davidson received the check he endorsed it, without restriction, and deposited it to his credit in plaintiff bank. At the time of making this deposit, Davidson was overdrawn at plaintiff bank in the sum of $369.59. Also, on Saturday morning, November 17th, Davidson made arrangements with plaintiff bank to borrow $2500, and this sum was deposited in plaintiff bank to his credit, and there were other deposits on this date made by Davidson to his account in plaintiff bank. On Friday, November 16th, Davidson drew a check on plaintiff bank for $18,062.49, payable to Henry Lichtig & Company, and on the 17th, another check payable to Lichtig for $860.53, and these checks were endorsed to defendant and were paid by plaintiff on the 17th. However, these last-mentioned checks are not of importance so far as concerns the merits of this cause, merely because they were paid to defendant. At the close of business on Monday, Davidson's balance

in plaintiff bank, after paying the above and other checks, was $238.50, which shows, considering the overdraft, that Davidson checked out $131.09 more than he deposited. The check sued on was deposited in plaintiff bank by Davidson on Saturday, November 17th, too late to clear through the clearing house that day, and did not reach the Commerce Trust Company, upon which bank it was drawn, until Monday, the 19th. When this check passed through the clearing house on Monday, the 19th, plaintiff received provisional credit and the check was returned from the clearing house to the Commerce Trust Company and there charged to the account of defendant, but this charge was later stricken, because defendant, in due time, had stopped payment. Davidson, who drew the check sued on, was in financial straits and on Monday, the 19th, sometime before noon, was asked by plaintiff for additional collateral, which he refused to give. He went immediately, as we infer, from plaintiff bank to defendant's office, and after some conversation with Mr. Lichtig and Mr. O. A. Severance, vice president of defendant, Davidson said to Severance, ''I am through. You better get busy and protect yourself.'' Mr. Severance says that this was between ten-thirty and eleven A. M., on Monday, the 19th, and that shortly thereafter he, by letter delivered by messenger to the Commerce Trust Company, stopped payment. Defendant's stop-payment letter was received by the Commerce Trust Company in time to be effective, although the check was charged to defendant's account before knowledge of the stop-payment letter got to the bookkeepers. Davidson was not a witness.

The story of the check from which the counterclaim grew is about as follows: On Saturday, November 17th, Davidson gave to Lichtig the check, which gave rise to the counterclaim, drawn on plaintiff bank for $18,377.42. This check was to take up some warehouse receipts theretofore pledged or assigned by Davidson, but not the receipts given for the check sued on by plaintiff. This $18,377.42 check was endorsed by Lichtig to defendant and by defendant deposited on November 17th to its credit in the Commerce Trust Company, but too late to clear that day. This check passed through the clearing house on Monday, the 19th, and the Commerce Trust Company received provisional credit against plaintiff for the amount of the check. But when the check reached plaintiff on Monday, the 19th, payment was refused because of insufficient funds in Davidson's account. When plaintiff refused payment of the Davidson check for $18,377.42, the Commerce Trust Company held the check sued on and plaintiff bank held the $18,377.42 check. In this situation, plaintiff bank and the Commerce Trust Company disposed of the matter between them by plaintiff giving its cashier's check to the Commerce Trust Company for $18,296.42, and the Commerce Trust Company gave its cashier's check to plaintiff for $18,377.42.

When this was done, plaintiff turned over to the Commerce Trust Company the $18,377.42 check, and the Commerce Trust Company turned over to plaintiff the check sued on. However, as we understand the record, before the turn over of these cashier's checks, the Commerce Trust Company received from defendant a check for $18,377.42, to take up the Davidson check for the same amount which defendant had deposited in the Commerce Trust Company on Saturday. Other pertinent facts will appear in the course of this opinion.

Plaintiff, on its appeal, assigns error on the refusal, at the close of the whole case, (1) of its instruction for a directed verdict on the check sued on; (2) on the refusal of its Instruction 8; (3) the modification of its instructions 1 and 3; and (4) the giving of instructions A and E for defendant. Defendant, on its appeal, assigns error on the court's peremptory direction to find for plaintiff on the counterclaim.

Was plaintiff entitled to a peremptory direction to find in its favor on the check sued on? If so, it will not be necessary to consider other assignments made by plaintiff. An epitome of the facts, though repetitious, will be helpful to a better understanding and appreciation of the situation. Plaintiff permitted Davidson to check on his account after the deposit of the check sued on, until the account was about exhausted, before the $18,377.42 check was presented to it through the clearing house on Monday. Defendant received credit in the Commerce Trust Company for the Davidson check drawn on plaintiff for $18,377.42, and when defendant gave its check on Monday, the 19th, to the Commerce Trust Company for $18,377.42, to take up the Davidson check for the same amount, which defendant had deposited in the Commerce Trust Company, such made defendant's account in the Commerce Trust Company the same as it was before it deposited the Davidson check. That is, left its account in the Commerce Trust Company, so far as balance, unaffected. When the Commerce Trust Company gave its cashier's check to plaintiff for $18,377.42, to take up the Davidson check drawn on plaintiff for the same amount, and received plaintiff's cashier's check for $18,296.42 to take up defendant's check to Davidson for the same amount, the *status quo ante* was established as to all concerned, except that plaintiff was left holding the $18,296.42 check sued on. And if plaintiff was not the owner, as defendant contends, of the check sued on, then Davidson's account in plaintiff bank was overdrawn at the close of business on Monday, the 19th, in the sum of $18,057.92.

Plaintiff contends that it treated as cash defendant's check for $18,296.42, while on the other hand, defendant contends that plaintiff took the check with knowledge of its infirmities as between defendant and Davidson for collection as Davidson's agent, and is bound by all the infirmities affecting the check as between defend-

ant and Davidson. It is conceded that the warehouse receipts which defendant received from Davidson, as the consideration for the check, were spurious, and that there was no consideration to defendant for the check. Defendant's contention that plaintiff took the check for collection only as the agent of Davidson is based upon the contents of the deposit slip upon which the deposit was made. This deposit slip had printed thereon the following:

"Depositor by using this slip agrees: (1) Items may be handled as customer's agents and under existing or future rules or regulations of the Kansas City Clearing House Association, of the Federal Reserve Board, and/or any Federal Reserve Bank to which forwarded: (2) this bank as agent, or owner, is not liable for neglect, default or failure of banks selected as agents or subagents, or for losses in transit; (3) items not on this bank are received at customer's risk, and, if credited, are credited conditionally, subject to payment, and may be charged back at any time until actual cash payment therefor is received, and checks of customer's may be refused if drawn against such conditional credits. (4) This bank and/or subsequent collecting banks or agents, may present or send items for payment direct to the bank on which drawn, or at which payable, or to another bank in that city, and may accept either cash, draft or check in payment of such items, and will not be liable for collection of drafts or checks so received; (5) should any item be not paid, or any bank fail to remit proceeds or issue paper therefor which is dishonored, any credit given may be cancelled whether or not the original item or dishonored paper sent therefor can be delivered to customer; (6) items drawn on this bank not good at close of business on day of deposit may be charged back to depositors; (7) items drawn on or by other banks or payable at other banks in this city, or Kansas City, Kansas, may be carried over for presentation under Clearing House arrangements or otherwise, on business day following date of deposit. Items payable outside of this city, need not be forwarded until business day following receipts; (8) customer agrees to indemnify this bank against any loss on account of any claim made by maker, drawee, or any prior endorser on any item by reason of handling on above terms."

We might state here that the Davidson check for $18,377.42 was deposited by defendant in the Commerce Trust Company on the same character of deposit slip as above set out.

The ledger sheet of plaintiff, showing deposits by Davidson and checks drawn thereon by him, from October 31st to November 20th, both inclusive, was introduced by plaintiff and shows that over this period Davidson deposited in plaintiff bank $308,882.13, and checked thereon until his balance was reduced to $17.25 at the close of business on November 20th. And among the deposits is the check sued on. The ledger sheet shows that on 23 balances of this account, Dav-

idson was overdrawn. The largest overdraft was in excess of $26,000, and 16 others were in excess of $17,000, but each overdraft was soon covered. Defendant argues from this that plaintiff did not honor Davidson's checks, until the account was about exhausted, because it *owned* the check sued on and considered it as cash, but because it relied upon Davidson to make good if the check was not paid.

Did plaintiff take the check sued on with knowledge of its infirmities as between defendant and Davidson? We shall first dispose of this question. There is no occasion to consider at length the subject of plaintiff's knowledge of infirmities. It is sufficient to say that there was no evidence that plaintiff had any knowledge of the spurious warehouse receipts or of anything tending to impart to it knowledge of the infirmities in the check as between Davidson and defendant. It is true that when plaintiff took back the check from the Commerce Trust Company, it has attached thereto the stop-payment slip. This was a form slip and the Commerce Trust Company, when defendant stopped payment, placed a check mark at the left of the words, "payment stopped," and attached this stop-payment slip to the check. The slip did not give the reason, nor did defendant's letter stopping payment give the reason as to why payment was stopped. On the issue of notice or knowledge plaintiff was entitled to a directed verdict. [Downs v. Horton, 287 Mo. 414, 230 S. W. 103; State ex rel. Arndt v. Cox, 327 Mo. 790; 38 S. W. (2d) 1079, l. c. 1084; Turner v. National Benevolent Society, 224 Mo. App. 463, l. c. 46, 28 S. W. (2d) 125; Meyer Milling Company v. Strohfeld, 224 Mo. App. 508, 20 S. W. (2d) 963, l. c. 968.]

Was it a question of fact for the jury as to whether plaintiff took the check sued on as Davidson's agent? Or to state it another way, was plaintiff, as a matter of law, the owner of the check? On its face the check was negotiable and plaintiff says that, under the facts, it became the unconditional owner and purchaser for value of the check as a matter of law and that there was no question for the jury on the subject of agency. Jefferson Bank v. Merchants Refrigerating Company, 236 Mo. 407, 139 S. W. 545, was a suit on a check. The facts in many respects parallel the facts in the instant case. In that case it appears that plaintiff, the Jefferson Bank, was a bank in St. Louis; defendant refrigerating company was in Kansas City. July 15, 1904, defendant issued to and mailed to the Mound City Produce Company in St. Louis, a negotiable bank check for $1491.25, drawn on the National Bank of Commerce of Kansas City, Missouri. This check was received by the produce company, Saturday, July 16th. July 18th, the produce company deposited this check, among others, in the Jefferson Bank endorsing the same without restriction. On the same day the produce company drew checks on the Jefferson Bank to an amount exceeding its deposits, including the refrigerating company's check. All these checks drawn by

the produce company were honored. The check in suit was forwarded by plaintiff to Kansas City on July 18th, but on July 19th, and before the check could be presented to the National Bank of Commerce, the refrigerating company stopped payment. The Jefferson Bank sued the refrigerating company on the check. The defense was (1) that the refrigerating company was not indebted to the produce company and that the check was issued by mistake and was without consideration; (2) that the Jefferson Bank was not the purchaser of the check for value; (3) that the Jefferson Bank was not the real party in interest; and (4) that the check was only endorsed to plaintiff for collection and that the real title to the check was in the produce company. There was printed on the cover of the deposit or pass book of the produce company issued by the Jefferson Bank, the following: "This bank in receiving out of town checks and other collections, acts only as your agent, and does not assume any responsibility beyond due diligence on its part, the same as on its own paper." The cashier of the Jefferson Bank sent the check to the National Bank of Commerce by letter, stating: "I enclose for collection and return items stated below." The cause was submitted to a jury under instructions. The jury found for plaintiff, Jefferson Bank, and on appeal complaint on the instructions and others were made. It was held that it was unnecessary to consider assignments; that under the facts plaintiff bank was entitled to an instruction directing the jury to find for it. The court said:

"We are not able to see how defendant could be entitled to submit to the jury the issue of whether or not the check was indorsed to the plaintiff for collection; because the evidence is uncontroverted that plaintiff allowed the produce company to draw out the whole amount of the check so deposited, on the very day of said deposit; and this constituted the plaintiff a purchaser of said check for value. This conclusion is also sustained by the course of dealing between plaintiff and the produce company, from which it appears that on every business day between the 1st and 18th of July, 1904, the said produce company deposited checks in the plaintiff bank, and was allowed by plaintiff to check out the amounts so deposited on the very days the deposits were made. In view of this course of dealing, we are warranted in holding that the indorsement printed on the cover of the deposit book of the produce company, to the effect that plaintiff only received out-of-town checks subject to collection, had been waived by plaintiff bank; a right it unquestionably had. The question of whether or not a check is received for collection or is purchased outright by a banker usually arises where the indorsements on the check are of a restrictive nature; such, for instance, as where the indorsement shows that it is merely made for the purpose of collection. However, in this case the indorsement was gen-

eral, and upon the uncontroverted facts proven, constituted the plaintiff a purchaser for value without notice that the check was issued without consideration.'' The court cited in support 5 Cyc. 498; Ayres v. Farmers & Merchants Bank, 79 Mo. 421; Kavanaugh v. Farmers Bank, 59 Mo. App. 540. It was also held in the Jefferson Bank case that the letter written by the cashier to the bank upon which the check was drawn was not any evidence that the Jefferson Bank held the check only' for collection.

Foristel v. Security National Bank, Savings & Trust Company, Garnishee, Wayne County National Bank, Interpleader, 320 Mo. 436, 7 S. W. (2d) 997, concerns facts quite similar in principle to the facts in the cause at bar. In that case, plaintiff, Foristel, sued the Thomas Rubber Company of Wooster, Ohio, and its individual members to recover $10,000 and interest. He sued out an attachment against defendants as nonresidents and garnishee bank was served with garnishment. At the time of service of garnishment, garnishee bank had in its hands a cashier's check for $2,562.37 and a trade acceptance of the Lion Tire Corporation of St. Louis for $8,900. Garnishee answered, setting up the respective contentions of plaintiff and interpleader. That is, that plaintiff claimed that the property in garnishee's hands belonged to the Thomas Rubber Company and that interpleader claimed to own the property. Thereafter, the interpleader filed its interplea, claiming to be the owner of the cashier's check and the trade acceptance. Plaintiff, in his answer to the interplea, denied that interpleader was the owner and alleged that the Thomas Rubber Company owned the cashier's check and the trade acceptance. It appears that the rubber company had shipped to the tire corporation a carload of automobile tires. The sale price was $11,462.37. By the bill of lading, the shipment was consigned to the shipper, the rubber company, with instructions to notify the tire corporation. The bill of lading was endorsed in blank by the rubber company and attached to a draft drawn on the tire corporation in favor of interpleader for $11,462.37, and signed by the rubber company. The draft was endorsed by the interpleader and sent to garnishee bank. The tire corporation accepted the shipment and took up the draft by paying to the garnishee bank $2,562.37 in cash, and by executing the trade acceptance for $8,900. Garnishee bank converted the cash into a cashier's check, treated as cash. Before garnishee bank remitted to interpleader it was garnished. The judgment below was against the interpleader. On the day the shipment was made the rubber company delivered to the interpleader bank in Ohio, the draft for $11,462.37 and the bill of lading and a trade acceptance in which the amount was left blank, payable to the rubber company, to be signed by the tire corporation. The entire face amount of the draft was then credited by interpleader to the checking account of the rubber company. The draft was credited to the

rubber company's checking account on July 26th. Garnishment was served August 14th. Between these dates the rubber company checked out of interpleader bank the entire proceeds of the draft and more, and was considerably overdrawn on August 14th. This was shown by the records of the interpleader bank.

Under the facts in the Foristel case the court held that it was not necessary to consider alleged procedural errors; that interpleader was entitled, as a matter of law, to a directed verdict, stating the general rule to be that "when a customer of a bank indorses to it a draft or similar commercial paper and the bank gives the account of such customer credit for the face of the draft and unrestrictedly authorizes such customer to draw checks against such account (in the absence of a showing to the contrary), the title to such draft is transferred to the bank as a matter of law and it is immaterial whether or not the customer thereafter exercises his right to check out the proceeds of such paper." The court cited, in support of the general rule, Ayres v. Farmers & Merchants Bank; Jefferson Bank v. Merchants' Refrigerating Co., supra; and Hendley v. Glove Refinery Co., American National Bank, Interpleader, 106 Mo. App. 20, l. c. 26, 79 S. W. 1163; Haas v. Kings County Fruit Co. (Mo. App.), 183 S. W. 676; Renfrow Commission Co. v. Northup Co. (Mo. App.), 222 S. W. 487; May v. Bank of Hughesville (Mo. App.), 291 S. W. 170, l. c. 171; Cairo National Bank v. Blanton Co. (Mo. App.), 287 S. W. 839, l. c. 840; and Bank of Buchanan County v. Gordon (Mo. App.), 250 S. W. 648, l. c. 649. See, also, National City Bank v. Macon Creamery Co., 329 Mo. 639, 46 S. W. (2d) 127; Farmers' Exchange Bank v. Farm & Home Savings & Loan Association, 332 Mo. 1041, 61 S. W. (2d) 717, and authorities there cited.

Section 5567, Revised Statutes 1929 (Mo. Stat. Ann., sec. 5567, p. 7711), a part of the Bank Collection Code, enacted in 1929, reads:

"Except as otherwise provided by agreement and except as to subsequent holders of a negotiable instrument payable to bearer or indorsed specially or in blank, where an item is deposited or received for collection, the bank of deposit shall be agent of the depositor for its collection and each subsequent collecting bank shall be sub-agent of the depositor but shall be authorized to follow the instructions of its immediate forwarding bank and any credit given by any such agent or sub-agent bank therefor shall be revocable until such time as the proceeds are received in actual money or an unconditional credit given on the books of another bank, which such agent has requested or accepted. Where any such bank allows any revocable credit for an item to be withdrawn such agency relation shall nevertheless continue except the bank shall have all the rights of an owner thereof against prior and subsequent parties to the extent of the amount withdrawn."

Section 5567 is set out and considered in Farmers' Exchange Bank

v. Farm & Home, etc., Assn., supra. Discussing this section, we said: "This act does not prevent the bank of deposit from purchasing or becoming the owner of the check with or without the right to charge or collect back the amount of same in case of failure to collect, for that comes within the excepting clause, 'except as otherwise provided by agreement,' but the enactment clearly proceeds on the basis of the bank of deposit being the collecting agent of the depositor of the check unless and until it is shown that it has been 'otherwise provided by agreement,' and this is true, notwithstanding credit, which is declared revocable, has been given the depositor for the deposited check and such credit has been allowed to be and has been withdrawn or checked against. The agency relation is not changed except to protect the bank to the extent the credit has been checked against. This is emphasized by making subsequent collecting banks sub-agents of the depositor and not of the bank of deposit."

The Bank Collection Code was enacted after the transactions giving rise to the instant case, but the law applicable to determine the title of the bank of deposit to a negotiable check or draft or other similar instrument, where the bank has paid out on the checks of the depositor, the full proceeds of the instrument, was the same as declared in Section 5567 of the Code. But defendant says that it was for the jury to say whether plaintiff paid out as claimed on Davidson's checks. Plaintiff's ledger sheet shows that it paid out on Davidson's checks as we have stated, but defendant says that it "never did concede the correctness of plaintiff's books or ledger sheet," and that it does not concede that the deposits made by Davidson were treated "as cash" and that "checks were honored and paid therefrom." But notwithstanding what defendant does not concede, the fact remains that plaintiff's books show that it did do exactly what defendant does not concede, and there is nothing to the contrary.

Defendant relies on National City Bank v. Macon Creamery Company, supra, among others, to support its contention that the question of plaintiff's title and ownership of the check was for the jury. Two drafts were involved in that case. These were drawn in Macon, Missouri, by the creamery company on the Kroger Grocery & Baking Company of St. Louis, and were payable to the Farmers Trust Company of Macon. The creamery company was a customer and depositor of the trust company and had been for some considerable time. The opinion recites that "at the time the creamery company began to do business with the trust company the president of the creamery company informed the president of the trust company that the creamery company carried on an extensive business with the Kroger Company in St. Louis, shipping its products to that company and drawing drafts on it for the purchase price thereof. It was

agreed that the trust company would accept these drafts as a deposit by the creamery company, give immediate credit therefor to the creamery company's account; that the creamery company would be permitted to immediately draw checks thereon; that if the drafts were not paid upon presentment, same might be charged against the creamery company's account; and that at any time the account was not sufficient to take care of charges against it the creamery company would deposit sufficient funds to meet such charges.'' The creamery company received credit in the trust company for the drafts in suit and the drafts were, with other items, endorsed and forwarded by the trust company to the National City Bank in St. Louis, for collection and deposit, and were there credited, with other items, to the account of the trust company. The drafts were presented to the Kroger Company, but as the shipment by the creamery company in payment for which the drafts were drawn, had not then been received, the Kroger Company, the drawee, requested the National City Bank to hold the drafts until the shipment arrived. While matters were in this situation the trust company ceased to do business and closed. Thereupon the creamery company notified the Kroger Company not to pay the drafts and the suit followed. The issues were submitted to the court sitting as a jury and the court found for the plaintiff, National City Bank. The defendant creamery company requested a directed finding which was refused. The creamery company contended that ''the legal result of the agreement between it and the trust company in reference to drafts to be drawn and deposited by it and the mode of dealing pursuant thereto, as shown by the evidence, was merely a convenient arrangement for collection of the drafts with the trust company acting as its agent for that purpose; that title to the drafts did not pass to either the trust company or plaintiff.''

The court, in that case, was considering the contention of the defendant creamery company that it was entitled to have a directed verdict. It was held that the evidence was sufficient to support the finding for the plaintiff, which was all that was necessary to determine. The court said, however, that ''the intention of the parties, as indicated by their agreement and their subsequent acts, conduct and mode and manner of dealing, shown by the evidence, was a question of fact for the trial court as a trier of the facts. . . .'' The excerpt quoted was based on the agreement between the creamery company and the trust company respecting deposits by the creamery company. But it will be also observed that the court in considering the subject of title to the drafts said: ''The evidence in this case clearly shows that under the agreement and course of dealing appellant drew the drafts payable to the order of the trust company and indorsed and deposited them for immediate credit, and thereupon appellant's account with the trust company was

credited for the whole amount thereof as a cash deposit and a like credit was given on appellant's passbook against which credit appellant had a right to immediately draw and during a long course of dealing did draw. Under such circumstances the drafts became the property of the trust company, and title thereto passed to the trust company.'' We do not think that the National City Bank case or any other supports defendant's contention that the question of plaintiff's title to the check sued on was for the jury. The subject of title to negotiable checks, drafts, etc., is considered at length in Farmers' Exchange Bank v. Farm & Home, etc., Assn., and other cases cited, supra, and a further consideration here would add nothing to the law. We rule, under the facts here, that plaintiff is the owner of the check sued on, and that its title thereto was not a question for the jury.

Defendant contends that it was for the jury to say whether or not the check was paid. We have already shown that defendant's account in the Commerce Trust Company was unaffected, in the end, by reason of the check sued on. Therefore, it follows that defendant has not paid the check. This theory of payment advanced by defendant is based on what occurred in the clearing house as to the check sued on, and, as we understand, on the fact that the Commerce Trust Company's bookkeepers charged the check to defendant's account before knowledge of the stop-payment letter reached them. It is conceded that defendant stopped payment on the check, but defendant says that it does not concede that the Commerce Trust Company ''refused payment of the defendant's check.'' Defendant says that the Commerce Trust Company merely asked plaintiff to take the check back as a favor, and that plaintiff took it back ''because by so doing it got the Commerce Trust Company to take back a check of Davidson for a still larger sum,'' and defendant says that the questions of whether payment was refused or payment was made were for the jury. The pertinent clearing house rules were in evidence. A. G. Biggerstaff, manager of the clearing house, was a witness for plaintiff and explained the clearing house *modus operandi* as follows:

''Well, the clearing house is to facilitate the exchange of checks in one place. Instead of the banks going with their own messengers to each bank in Kansas City and collecting their checks, they all come to the clearing house at one time and one hour, eleven-thirty on week days, except Saturday, at which time it is ten-thirty. They bring their checks all listed on a sheet opposite the name and number of the banks on which the checks are drawn and then they distribute those checks to the various banks in their stall and then the clerks of that bank list the checks on what we call incoming items opposite the bank bringing the checks to the clearing house. Then those are totaled, both the amount that comes in and the amount that

goes out, and the difference between each individual bank represents either a credit or a debit balance. For instance, if they brought more than they take out then they would have a credit balance, or *vice versa*, debit balance if it was the other way. Q. Are the checks examined in the clearing house? A. No, sir. Q. How do they come in? A. They come in in bundles. Each bank assorts their checks by banks with other banks and the ones on each individual bank are rubber-banded in a bundle with an adding machine list on the outside with the total in plain view. Q. It is a fact that the clearing house and the messengers in handling the transactions deal solely with those totals? A. Yes, sir. Q. The bundles are not opened? A. No, sir. Q. In other words, does the clearing house pay any attention to the individual checks? A. No, sir. Q. Then what is done with the checks after they are separated? What do the messengers do with them? A. Take them back to their banks. Q. You just said that the clearing house paid no attention whatever to any individual checks. Do you mean by that that if there is a forged check or a raised check or a check drawn by a man who had no account in the bank or stop-payment check that the clearing house association pays no attention to that? A. No. Q. None whatever? A. We don't take any notice of it. Q. Don't know anything about it? A. No, sir. Q. Do you try to find out anything about it? A. No, sir. . . . Q. When the checks go back to the banks, we will assume that there is a stop-payment check in it or insufficient funds or forgery or, as I say, a check drawn by some man on a bank where he has no account at all, do those come back to the clearing house? A. Yes, sir. Q. Now, tell about that. A. When they take them to their banks, of course, they are checked and if there is an item that is to be returned for any reason we have what we call a go-back clearing at three o'clock in the afternoon with the exception of Saturday, when it is one o'clock. At that time all checks that are returned for any reason are listed in the same manner as the checks that come into the main clearing in the morning at eleven-thirty. They are listed in totals. If there are more than one check returned to any bank they are listed and rubber-banded with a machine list on the outside and list on their clearing house sheet coming in just the same as the morning clearings. Then the other banks distribute their checks in the same way and a balance is struck in the same manner as it is at the general clearings in the morning. Q. Do you pay any attention or inspect those go-back checks? A. No, sir.''

The clearing house rules provide that ''all checks or other items listed at the clearing house on which payment has been refused on examination at the office of the member on which they are cleared, shall be returned to the clearing house on the same day at 3:00 o'clock P. M. except Saturday, when they shall be returned at 1:00

o'clock P. M. . . . Under the rules, if a bank fails to return to the clearing house a check, upon which payment has been refused, before the expiration of the go-back time, then such item may be taken up at the counter, that is, at the endorser bank. An item taken up at the counter is called a late go-back, and according to the record, late go-backs were of frequent occurrence. The rules provide a small penalty on the banks who have late go-backs, but there is nothing in the rules which affects the right of a member bank to return a check to an endorsing member under the late go-back rule, if agreeable to the endorsing member. It follows, therefore, that plaintiff bank and the Commerce Trust Company had the right under the clearing house rules and practice among the member banks, to dispose of the $18,296.42 check sued on, and the check for $18,377.42, as they did. Plaintiff bank had endorsed the $18,296.42 check and the Commerce Trust Company had endorsed the $18,377.42 check, and under the clearing house rules, each of these banks consenting, they had the right, as stated, to dispose of the matter as between them, under the late go-back rule, as they did dispose of it. But defendant argues that when plaintiff gave its cashier's check to the Commerce Trust Company for $18,296.42, and took back the check sued on for the same amount, such was "a new deal between the banks." Of this, defendant in its brief, says: "The plaintiff's evidence is that the Commerce had defendant's check (sued on here) in its possession after three P. M. on Monday, November 19th, and that the Liberty then had credit therefor on the books of the clearing house. The defendant's evidence is that the check was then actually charged against the Vanderslice-Lynds account in the Commerce, which account was ample to pay it. The Commerce, under the clearing house rules, could not force the plaintiff to accept its return and the plaintiff was not obligated to accept its return or give back the credit it had against the Commerce for its amount. The Commerce thereafter merely asked the Liberty if it would take the check back and the Liberty voluntarily entered into an agreement to do so. This was no refusal to pay on the part of the Commerce. It could not refuse to pay under the clearing house rules and in fact credit had been given the Liberty, and the defendant's account had been charged."

Such reasoning overlooks the fact that under the clearing house rules plaintiff bank and the Commerce Trust Company could, each consenting, dispose of the matter between them as they did, which we again repeat, and, it seems to us that such reasoning presupposes that the Commerce Trust Company had no right to recognize defendant's stop-payment order, and if it did not, then the charge against defendant's account in the Commerce Trust Company should not have been stricken. However, defendant makes no such contention. It is true that O. R. Leweke, in charge of the bookkeeping de-

partment of the Commerce Trust Company and a witness for defendant, testified that J. A. Kennedy, assistant cashier of plaintiff, said to him at plaintiff bank when they were discussing the check sued on and the $18,377.42 check, that plaintiff "had a check (the $18,377.42 check) that we (Commerce Trust Company) cleared on them (plaintiff) and if I would take that back he would take care of mine." Kennedy, however, says that there were no conditions connected with plaintiff bank taking back the check sued on. Defendant, by its course of reasoning, would make the controversy one between the two banks and still retain in its favor the stricken charge against its account in the Commerce Trust Company. In its petition, plaintiff alleged that the Commerce Trust Company refused to pay the check sued on because defendant stopped payment. Defendant's original answer, which was introduced in evidence, alleged that it stopped payment. In the amended answer, upon which the cause was tried, defendant does not specifically allege that it stopped payment, but alleges that plaintiff obtained possession of the check from the Commerce Trust Company "with notice that neither the maker thereof nor Commerce Trust Company would thereafter make any further payment to plaintiff" or Davidson "on or by reason of said check." The trouble is, as we have shown, defendant has not made *any* actual payment of this check at any time, and no one else has paid it or any part of it. There is no evidence, not a scintilla even, to support the submission of payment to the jury. It is our conclusion that plaintiff's request for a directed verdict on the check sued on should have been given.

█ We come now to defendant's appeal alleging error on the peremptory direction to find for plaintiff and against defendant on the counterclaim. Defendant presents its theory of the counterclaim in this wise: "The check of Davidson for $18,377.42 drawn on the Liberty and of which Vanderslice-Lynds was the holder in due course, had been presented by the Commerce, (with whom it had been deposited by defendant) to the Liberty on the morning of November 19. The Commerce (as agent for defendant) has received credit for the amount of said check against the Liberty on the books of the Kansas City Clearing House and the Federal Reserve Bank. The Liberty retained the check in its hands until well after three o'clock in the afternoon. Under the rules of the clearing house plaintiff could not force the Commerce to accept the return of the check. The Commerce, without disclosing these facts to defendant, Vanderslice-Lynds, went to Liberty and obtained the Davidson check and got Vanderslice-Lynds to take it up (i. e., give the Commerce a check in the same amount), in effect representing that the Liberty had not paid the Davidson check and would not pay it because of insufficient funds. The evidence is that the Commerce converted this latter check of defendant, Vanderslice-Lynds, into a cashier's check

of the Commerce in favor of the Liberty for $18,377.42 and delivered it to the Liberty which cashed it. Under those circumstances it was a question for the jury, and the jury might find that the Davidson check in favor of Vanderslice-Lynds had been paid to the Commerce and that Vanderslice-Lynds was, therefore, entitled to retain the $18,377.42 credit which it had been given on the books of the Commerce when it deposited the check. If the jury found that Vanderslice-Lynds was entitled to keep this credit, then the Liberty received back from Vanderslice-Lynds through the Commerce the sum of $18,377.42, which the Liberty was not entitled to retain, and Vanderslice-Lynds having paid it back because of ignorance of the facts, is entitled to recover.''

The fallacy of defendant's theory on the counterclaim is that its check for $18,377.42, given on Monday, November 19th, to the Commerce Trust Company, was.converted into the cashier's check given by the Commerce Trust Company to plaintiff. This check of defendant, it is true, was charged against the account of defendant in the Commerce Trust Company, but the ledger sheet of this account which is in the record, shows that the balances were· so adjusted that in the end, as we ruled, defendant's account was unaffected as to balance. In disposing of plaintiff's case on the $18,296.42 check, we have already ruled that there was no evidence on which to submit to the jury the question of payment of the check on which plaintiff sued. Neither plaintiff nor the Commerce Trust Company was enriched by the $18,377.42 check that defendant gave on Monday to the Commerce Trust Company to take up the Davidson check, for the same amount, which defendant deposited in its account on Saturday in the Commerce Trust Company. As supporting its contention that the issues on the counterclaim were for the jury, defendant cites in its brief National Bank of Commerce v. Mechanics' American National Bank et al., 148 Mo. App. 1, 127 S. W. 429; Maget v. Bartlett Bros. Land & Loan Co., et al., 226 Mo. App. 416, 41 S. W. (2d) 849; Clifford Banking Co. v. Donovan Commission Co., 195 Mo. 262, 94 S. W. 527; Third National Bank of St. Louis v. St. Charles Savings Bank, 244 Mo. 554, 149 S. W. 495; and Murry et al. v. Central Bank, 226 Mo. App. 400, 40 S. W. (2d) 721.

National Bank of Commerce v. Mechanics' American National Bank, supra, was between two clearing house members. Defendant in the cause at bar is not a member of the clearing house, hence cannot claim the benefit of the clearing house rules. In Merchants National Bank v. National Bank of Commonwealth, 139 Mass. 513, 2 N. E. 89, it is ruled that as to ''the regulations of this association (clearing house) the customers of the banks are not parties, and whatever effect is to be given to them as between the banks, their customers are not in a situation to claim the benefit of them, nor

are they liable to be injuriously affected by them." [See, also, National Exchange Bank v. Ginn et al., 114 Md. 181, 78 Atl. 1026, 33 L. R. A. (N. S.) 963.] Also, so far as appears, in the case of Merchants National Bank v. National Bank of Commerce, there was no late go-back rule involved under which, as here, an item could, the endorsing bank consenting, be taken up at the counter. In the Maget case the two banks there concerned dealt with each other in the transaction involved under the reciprocal method, explained in the opinion, and such was not the case here.

It is not necessary to discuss the other cases relied on by defendant. They do not support defendant's contention, and we find no case that does.

The judgment on the counterclaim should be affirmed, and in plaintiff's suit on the check, the judgment should be reversed and the cause remanded with direction to enter judgment for plaintiff in accordance with the prayer of its petition. It is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.