## POWERS *v.* STATE OF INDIANA.

[No. 25,768.   Filed February 20, 1933.   Waiver of rehearing March 3, 1933.]

*John E. Osborn, E. E. Hite, Robert McKay* and *Frank Hamilton,* for appellant.

*James M. Ogden,* Attorney-General, and *E. Burke Walker,* Deputy Attorney-General, for the State.

FANSLER, J.—The appellant, Powers, was indicted for murder in the first degree; tried and convicted of murder in the second degree.

He assigns as error the overruling of his motion to quash the indictment and the overruling of his original and supplemental motions for a new trial. The only questions presented arise on the motion for a new trial, and principally involve the rulings of the court on the admissibility of evidence.

The record discloses that the appellant, Powers, and the decedent, Fulks, were neighbors living almost directly opposite each other in the city of Greensburg; that they were both past 60 years of age, and, previous to the controversy which resulted in the death of Fulks, had been on good terms. Many character witnesses testified to the good reputation of Powers and their evidence is not controverted by the state. Powers was a plasterer and, in addition to that business, for sometime had been conducting a small restaurant and grocery store. On the day of the homicide he came home from his work of plastering, unloaded his car, changed his clothes and drove into the city to purchase supplies. He noticed that Fulks had placed a "no parking" sign on his lawn almost directly opposite the Powers establishment. A street leading to the Powers garage was being repaired and Powers had parked his car occasionally in front of the Fulk house, as had customers of the Powers restaurant. While in the city Powers inquired of a police officer concerning the right of Fulks to prevent parking in the street and was told that there was no

ordinance or state law preventing such parking. Upon his return he parked his car in front of the Fulks residence, took his purchases into his place and sat on the porch resting. He had in his pocket a revolver, which he testified he kept about his restaurant and carried at times for protection, especially when he had large sums of money upon his person, which he frequently did, and that at the time of the homicide he had in his pocket $112.75.

While Powers was sitting on his porch, Mrs. Fulks was sprinkling her yard, or the street. She asked Powers to move his car, which he said he would do in a little bit. In a short time Fulks came out and took up the sprinkling and he asked Powers to move the car. Powers got up and started across the street to where his car was parked, and while he was going across an altercation arose between them concerning the car. Both seemed to have become angry, and when Powers met Fulks at the curb where the car was parked blows were exchanged. There is much uncertainty and confusion as to who struck the first blow. The combat continued for some little time. Witness McMillin and his wife and daughter ran to the combatants, some of them carrying croquet mallets. There is much conflict as to whether they engaged in the combat as partisans of Fulks or as peacemakers, as claimed by McMillin. Powers retreated or was forced backwards, pursued by Fulks. Somewhere near the middle of the street Powers drew his revolver from his pocket and fired the first shot. He seems to have continued withdrawing with Fulks pursuing him while three more shots were fired. As to when McMillin left the proximity of the principals there is sharp conflict. Powers testified that McMillin reached in his pocket and that Powers then drew his revolver and fired the first shot. There is some evidence that McMillin took a knife from his pocket, which

he gave up to his daughter, and there was an offer to prove that McMillin stated afterwards that if he had had his knife he would have cut Powers with it. There is evidence that after the McMillins joined the combat croquet mallets were swinging in the air and blows were struck with them, and evidence that Powers was severely bruised about the head, shoulders and arms and was bleeding from at least one severe wound on his head near the right temple. As is usual in such circumstances, no two of the witnesses agree as to what took place and there is much conflict and confusion in the evidence.

Appellant sought to show by the evidence that he shot in self-defense. The jury was required to determine, among other things, whether the appellant reasonably and in good faith believed it was necessary to fire the fatal shot in order to protect himself from death or great bodily harm. This question could be determined only from a consideration of the testimony of the appellant together with all the other evidence tending to show the situation as it presented itself to the appellant during the controversy. If any evidence which would throw light upon the transaction as it presented itself to him at the time was excluded we cannot say that the appellant was not prejudiced thereby and that that item of evidence might not have been sufficient to change the result.

The appellant has saved and presented more than fifty questions involving the ruling of the court in admitting or rejecting evidence. To discuss each question in detail would unduly extend this opinion and, therefore, we will endeavor to consider the questions in groups.

It is well settled that any fact may be put in evidence that will show bias, prejudice or antagonism on the part of a witness toward the defendant.

One of the state's witnesses was Frank McMillin who is referred to above as having taken an active part in the controversy. McMillin's evidence is in sharp conflict with the appellant's story of what transpired. McMillin claimed that he joined the encounter merely as a peacemaker and in an effort to separate the combatants. Appellant claimed that McMillin was an active and dangerous antagonist allied with Fulks. If the jury believed McMillin's testimony they must have believed that Powers was faced with but one antagonist, who was unarmed, and that appellant greatly exaggerated the apparent danger that confronted him at the time he fired the shots.

Appellant's counsel, on cross-examination, asked the witness McMillin numerous questions concerning statements made by him at times varying from a few minutes until several hours after the controversy. These questions assumed that he said that if he had had his knife with him he would have used it against Powers, and that after his wife and daughter had pulled him away he had said, "let me loose and I will go out and cut the guts out of the son-of-a-bitch," meaning and referring to Powers. The witness denied making the statements. Appellant laid the foundation for impeachment and called numerous witnesses by whom he sought to show that these statements had been made. The court excluded the evidence, apparently on the ground that it was collateral to the issue. If McMillin made the statements, it would tend to show a feeling of antagonism toward Powers which the jury would have a right to consider upon the question of his credibility; and it would tend to show that he was a partisan of Fulks and antagonistic to Powers; that he entertained a feeling toward Powers which, if apparent from his activity in the combat, might reasonably have led Powers to believe that he was in dan-

ger of mortal injury. If McMillin was antagonistic to Powers during and after the combat, and his denial that he made the statements tending to show his antagonism was untrue, the jury should have known it. The impeaching testimony might have so discredited him in the eyes of the jury as to entirely change the result of the trial. Excluding the evidence was error prejudicial to the rights of the appellant.

Numerous questions propounded by appellant called for a conclusion of the witness. An illustration is the question propounded to the witness, William Morgan: "As far as you could see or hear, there was no occasion for Mr. Powers to say that to Mr. Fulks—for him to come out in the street?" Another is the question propounded to Harry Lacey: "You did not expect him to have any trouble, did you?" Objections were sustained. These questions were asked on cross-examination. The latitude permitted must be determined by the court in the exercise of its discretion, and where immaterial matter is excluded it cannot be treated as an abuse of discretion.

The state was permitted to prove that the appellant did not have a permit to carry a pistol or revolver. It must be assumed that the jury considered this evidence for some purpose. We cannot say that it did not influence them in arriving at their verdict and without it the verdict might not have been different. If Powers did not shoot in self-defense, a permit to carry a pistol would not help his defense, and if he did honestly and reasonably believe that it was necessary to shoot in self-defense, the fact that he was carrying a pistol without a permit would not deprive him of the right to defend himself or to be acquitted upon that ground. The shooting, if unlawful, could not be justified by a permit to carry a pistol, and, if the shooting was necessary to protect the appel-

lant from death or great bodily harm, he was not required to forego protecting himself and suffer death or great bodily harm merely because he was carrying his pistol without a permit. The death of Fulks did not result from the carrying of the pistol. It resulted from the deliberate act of firing the pistol. *Potter* v. *State* (1904), 162 Ind. 213, 70 N. E. 129; *Males* v. *State* (1927), 199 Ind. 196, 156 N. E. 403.

The appellee, in its brief, calls attention to §8025 Burns R. S. 1926, which is as follows: "In the trial of a person charged with committing or attempting to commit a felony against the person or property of another while armed with a pistol or revolver, without having a permit to carry such firearm as hereinbefore provided, the fact that such person was so armed shall be prima facie evidence of his intent to commit such felony."

The court does not seem to have incorporated this section into an instruction and appellant does not complain that it was read to the jury in argument. However, appellee contends that evidence of the fact that appellant did not have a permit to carry a pistol was competent on the question of intent—that its proof established a *prima facie* case of felonious intent, and that, "It is within the power of the legislature to declare what shall be prima facie evidence of an ultimate fact—intent for instance, and that is as far as the statute goes."

The term "prima facie evidence" in statutes such as the one under consideration has been interpreted to mean such evidence upon the subject as, standing alone, will be sufficient to sustain a verdict.

The power of the legislature to decide and provide by statute that evidence of a certain fact shall be considered *prima facie* evidence of another fact which is required to be determined by a jury in order to estab-

lish the guilt of the defendant in criminal cases has often been questioned. Some confusion has arisen from a failure to distinguish between enactments of the legislature which are descriptive of the crime defined and those which seek to lay down a rule by which criminal intent may be inferred, prima facie, from the proof of certain circumstances. Further confusion is added by declarations upholding certain statutes as within the legislative power where in fact the statute did not infringe the right of a defendant or seek to give any new effect to a proven fact, but merely declared that facts universally recognized as indicating guilt shall be sufficient prima facie evidence of it.

In the case of *Voght* v. *State* (1890), 124 Ind. 358, 24 N. E. 680, Mitchell, J., speaking for this court, used the following language: "While we should unhesitatingly declare a statute void which attempted to enact that a person should be convicted of an offense upon proof of facts which might be consistent with innocence, or which attempted to make certain evidence conclusive of guilt (*State* v. *Beswick,* 13 R. I. 211), yet it has often been held that the legislature, in defining a crime, may also enact that proof of facts which are universally recognized as indicating guilt shall be sufficient *prima facie* evidence of the commission of an offense defined by statute. For example, it is enacted in Section 1817 R. S. 1881, that the failure of a public officer to account for and pay over public money, which has come into his hands, shall be *prima facie* evidence of the embezzlement thereof, . . ." Facts which are universally recognized as indicating guilt, such as the failure of a public officer to account for and pay over public money which has come into his hands, are prima facie evidence of guilt without any legislative enactment, and if the legislature is confined to designating such facts as prima facie evidence and the designation

of facts which might be consistent with innocence is beyond their power, enactments on the subject are of no force or effect in either event.

In *Johns* v. *State* (1885), 104 Ind. 557, 4 N. E. 153, the court said, in reference to a statute providing that upon prosecutions for obstructing a highway, it shall be sufficient to prove that it is used and worked as such: "The purpose of the statute is to dispense with the tedious and sometimes difficult proof that the way is a public highway, where in fact there is or ought to be no real controversy about that fact." But it will be observed that the provision referred to is part of the criminal statute declaring against the obstruction of a public highway, and evidences a legislative intention to include highways which are used and worked. The legislature, in defining the misdemeanor, was not required to limit its operation to public highways in the statutory sense and had the right to make it a misdemeanor to obstruct any highway "used and worked." The provision did not, in any sense, attempt to evaluate evidence affecting criminal intent.

The case of *Morgan* v. *State* (1888), 117 Ind. 569, 19 N. E. 154, was an appeal from a prosecution for renting a room to be occupied for gaming. The court discussed the effect of a statutory enactment providing that evidence that gambling was actually carried on and the owner knew, or had good reason to believe, that it was carried on, would be sufficient to sustain the conviction. The jury was instructed accordingly. The court held that the enactment was within the power of the legislature. But it will again be observed that the fact that the appellant knew, or had good reason to know, that the room was being used for gambling would be proof enough, without the statute, to sustain a conviction.

In *Burrows* v. *State* (1893), 137 Ind. 474, 37 N. E.

271, the court said that where the value of the subject of larceny, such as money, is fixed by law, proof of value is not necessary, and that where the value of bills of exchange, drafts and checks are *prima facie* fixed by statute, the value need not be proven. The effect, however, of making negotiable instruments subjects of larceny and fixing their *prima facie* value is within the legislative power—descriptive of the defense declared against—and does not attempt to fix the weight of evidence as affecting criminal intent.

In *State* v. *Beach* (1896), 147 Ind. 74, 43 N. E. 949, 46 N. E. 145, 36 L. R. A. 179, the court, after quoting the language from *Voght* v. *State, supra,* which we quote above, said: "We think it clear that the legislature has the power to prescribe rules of evidence and methods of proof. A law which would in effect exclude the evidence of a party and thereby deny him the right to be heard would deprive him of due process of law. A law which provides that certain facts are conclusive proof of guilt would be unconstitutional, as also would one which makes an act *prima facie* evidence of crime which has no relation to a criminal act, and no tendency whatever to establish a criminal act. If, however, the legislature in prescribing the rules of evidence in any class of cases leaves a party a fair opportunity to establish his case or defense and give in evidence to the court or jury all the facts legitimately bearing on the issues in the cause to be considered and weighed by the tribunal trying the same, such acts of the legislature are not unconstitutional.

"It has repeatedly been held that the legislature has the right to declare what shall be presumptive or *prima facie* evidence of any fact."

The court then cites as supporting its statement, or at least the last sentence thereof, *Voght* v. *State, supra;*

*Morgan* v. *State, supra;* and *Richards* v. *Carrie* (1896), 145 Ind. 49, 43 N. E. 949. But it will be observed that the opinion in *Voght* v. *State, supra,* strictly limits the legislative power and that the opinion in *Morgan* v. *State, supra,* does not go nearly so far. In *Richards* v. *Carrie, supra,* it is merely held that a legislative enactment making a tax deed *prima facie* evidence of title is valid, and thus it does not affect a criminal case.

Enactments, such as the one under consideration, seek to establish a weight for certain evidence as affecting criminal intent. The authorities here cited, other than *State* v. *Beach,* give no support to the theory that the legislature has any such power. We agree that an enactment which would make a fact *prima facie* evidence of crime which has no relation to a criminal act, and no tendency to establish a criminal act, would be unconstitutional. But we must go farther and hold that before a proven fact can constitute *prima facie* evidence of criminal intent, it must be sufficient of itself to sustain a conviction without support of statutory enactment. We cannot agree with the proposition that if the legislature gives a party a fair opportunity to establish his defense, and give evidence, the enactment is constitutional. Such a rule would require a defendant to prove himself innocent, notwithstanding the evidence against him, unsupported by legislative enactment, would not be sufficient to sustain a verdict of guilty.

In the case of *Darbyshire* v. *State* (1925), 196 Ind. 608, 149 N. E. 166, this court said: "Expressions may be found in the books which, at a glance, seem to indicate a recognition of power in the legislature to declare certain facts conclusive proof of guilt, or to make an act *prima facie* evidence of crime regardless of its relevancy to a criminal act, but it has no such power. *State* v. *Beach.* It may, however, 'make certain acts or facts

*prima facie* evidence of other facts necessary to be established in a legal proceeding.' "

If the word "crime" is treated as involving criminal intent, it will be seen that the opinion is in exact accord with our present views. In so far as *State* v. *Beach, supra,* is in conflict with this opinion, it is overruled.

Appellant's supplemental motion for a new trial is based upon the allegation that certain jurors, who answered on their *voir dire* that they had not expressed an opinion concerning the guilt of the defendant, had in fact previously expressed an opinion. Affidavits were filed supporting the allegation. Evidence was heard upon the question, which was conflicting, and the court held against appellant's contention. We cannot disturb the court's finding upon this question.

It was proper for appellant to prove that he had a considerable sum of money on his person at the time of the controversy for the purpose of accounting for his carrying the pistol, and he was not limited to his own testimony on this subject. It was error to exclude the testimony of the police officer as to the amount of money found on Powers (appellant) when he searched him after his arrest.

The instructions complained of by appellant perhaps do not state the law as clearly as might be done by the use of more carefully selected language. We believe, however, that on the whole the jury was not misled as to the law and that the appellant was not harmed.

Judgment reversed with instructions to sustain appellant's motion for a new trial.

The clerk of this court will issue the proper order for the return of the prisoner to the custody of the sheriff of Decatur County.

Myers, J., not participating.