CLARA E. KELLOGG ET AL., Appellants, v. ANDREW J. MURPHY, SR., ET AL.—164 S. W. (2d) 285.

Division Two, September 8, 1942.

1166

*Clif Langsdale, John M. Langsdale* and *Clyde Taylor* for appellants.

*George A. Rozier,* Chief Counsel, and *Mahlon Z. Eubank,* Assistant Counsel for respondents; *Harry G. Waltner, Jr.,* of counsel.

1168

1170

[REDACTED]

ELLISON, J.—This appeal from the Jackson county circuit court presents the question whether the appellant Clara E. Kellogg is an "employer" within the meaning of subsection (h) secs. 1, 4, of Sec. 9423, R. S. 1939, Mo. R. S. A. sec. 9423 (h) 1, 4, of the State Unemployment Law. The constitutionality of these provisions also is attacked, as being violative of the 14th Amendment, Constitution of the United States, and Sec. 30, Art. II, and Sec. 3, Art. X, Constitution of Missouri. The respondent members of the Unemployment Compensation Commission awarded Ross C. Wilson, an employee, monetary "benefits," entailing the payment of an excise tax, called "contributions," by the appellant employer under Sec. 9427, R. S. 1939; Mo. R. S. A., sec. 9427, as against her defense that she was not within the Act. On review the circuit court affirmed the decision of the Commission.

The undisputed facts were that the appellant solely owned and operated an unincorporated general printing business, conducted under the name Kellogg-Baxter Printing Co. at 301 Admiral Boulevard, Kansas City, Missouri. It had seven employees, of whom the claimant Ross C. Wilson was or had been one. She also owned 70% of the capital stock of the Creel Publishing Company, a corporation, located at the same address. That company's sole business was the composition, publication and circulation of a weekly society newspaper called The Independent. It had four employees, making eleven in the two establishments. The Creel company owned no printing machinery. The Kellogg-Baxter Company printed the newspaper for it, receiving pay therefor. For many years there had been no other connection between the two companies. They had separate employees and kept separate books. Mrs. Martha Nichols Gaylord managed the Creel company, or at least was responsible for the publication of The Independent, as appellant's personal representative.

Referring always to said Sec. 9423, subsection (g) provides as follows (italics and parentheses in quotations hereafter are ours):

" 'Employing unit' means any individual or type of organization, including any partnership, association, trust, estate, joint-stock com-

pany, insurance company or corporation, whether domestic or foreign, or the receiver, trustee in bankruptcy, trustee or successor thereof, or the legal representative of a deceased person, which has or subsequent to January 1, 1936, had in its employ one or more individuals performing services for it within this state. All individuals performing services within this state for any employing unit which maintains *two or more separate establishments within this state* shall be deemed to be employed by a single employing unit for all the purposes of this law.''

The mooted subsection (h), paragraphs 1 and 4, further provide:

'' 'Employer' means:

''(1) Any employing unit which for some portion of a day, but not necessarily simultaneously, in each of twenty different weeks, whether or not such weeks are or were consecutive, within either the current or the preceding calendar year, has or had in employment, *eight or more individuals* irrespective of whether the same individuals are or were employed in each such day; . . .

''(4) Any employing unit which, together with one or more other employing units, is *owned or controlled* by legally enforceable means or otherwise, directly or indirectly, *by the same interests,* or which *owns or controls one or more other employing units* by legally enforceable means or otherwise, and which, if treated as a single unit with such other employing units or interests, or both, would be an employer under paragraph (1) of this subsection;''

The referee for the Commission found, and the Commission *adopted* the finding, that: ''The employer (appellant) maintains and *proved* that the ownership and separate entity of the two organizations have been in existence for many years and was not created for the purpose of avoiding the tax payments or contributions under the Social Security Act and the Missouri Unemployment Compensation Laws.'' Nevertheless the Commission made this finding in its decision:

''In this case the testimony shows, and it is admitted, that appellant owned 70% of one corporation and is the owner of the entire interests in the other corporation (the Kellogg-Baxter company was *not* a corporation) and that the two are operated at the same address and on the same premises; and the publishing company publishes a weekly paper which is printed by the printing company and paid for by the publishing company; and the printing company carries on a general printing business in addition to printing the publication of the publishing company. These two lines of business are conducted by the same interests and owned and controlled by the same interests *and are operated practically as one business.*

''The Commission is of the opinion that it was certainly within the power of the Legislature to declare that under conditions existing in this case, these two corporations should be treated as a single unit

for the purpose of carrying out the objects of the Unemployment Compensation Act of Missouri.''

▉ Under Sec. 9432 (i), R. S. 1939; Mo. R. S. A., sec. 9432 (i), we are bound by the findings of the Commission as to the facts, if supported by competent evidence. But we think and hold there was no factual evidence whatever to support the Commission's finding that the two businesses were ''operated practically as one business.'' That conclusion is directly contrary to the finding of its referee, which it adopted. Further, the refereee's conclusion in his report to the Commission did not rest on the theory that the two businesses had been fused and operated as one. He found that in spite of their long continued, bona fide and complete separation the appellant was within the act because the ownership and control of both were fixed in her.

▉ Appellant further contends here that there was no competent evidence showing she *owned and controlled* the Creel company, although she admittedly held 70% of the capital stock. This contention is based on the theory that a corporation is a legal entity separate and apart from its stockholders; that they have no title to the corporate property; and do not control the corporation because the statute, Sec. 5346, R. S. 1939; Mo. R. S. A., sec. 5346, vests that power in the board of directors. We cannot uphold that contention. It was not made before the Commission. On the contrary, when one of the Commissioners asked appellant's counsel this question: ''She admits the fact that she had control of the one (the Creel company) and owns the other (the Kellogg-Baxter company);'' the attorney replied, ''That's right.'' There is also substantial evidence in the record that appellant did actually control the Creel company. Furthermore, the owner of a majority of the stock in an ordinary corporation has ▉ potential control and can obtain actual control by legally enforcable means.[1]

We think the proof established that appellant controlled both businesses but that they were in good faith wholly separate and distinct save for physical propinquity, and the publication by the Kellogg company of the newspaper for the Creel company. The ultimate questions are: (1) whether subsection (h)4, properly construed, means they shall be treated as a single employing unit; (2) and if it does mean that, is the subsection constitutional? But respondents further ask us to uphold their finding, independently of the proof of actual control of both businesses separately, on the sole ground that appellant owned a major interest in both. That issue was squarely put during oral argument. Respondents' counsel were asked

[1]Jones v. Williams, 139 Mo. 1, 25, 39 S. W. 486, 490; Brown v. Citizens' State Bank, 345 Mo. 480, 488, 134 S. W. (2d) 116, 121; New Haven Metal & Heating Sup. Co. v. Danaher, 128 Conn. 213, 21 Atl. (2d) 383, 388 (15); U. C. C. v. Ice & Coal Co., 216 N. C. 6, 9, 3 S. E. (2d) 290, 292; Maine U. C. C. v. Androscoggin Jr., Inc., 137 Me. 154, 161, 16 Atl. (2d) 252(10).

whether it was their contention that if a single individual owned or controlled, say, a barber shop in northwest Missouri with six employees and a hamburger stand in southeast Missouri 600 miles away with two employees, the two businesses would be treated as a single employing unit with eight employees. They answered in the affirmative. In other words it is the respondents' view that the two businesses need have nothing in common except the fact that they are either owned *or* controlled by the same individual or interests.

The various state unemployment compensation acts stem from the Federal Social Security Act, 42 U. S. C. A., secs. 301-1305, the constitutionality of which was sustained in the United States Supreme Court by a five to four vote, Chas. C. Steward Mach. Co. v. Davis, 301 U. S. 548, 81 L. Ed. 1279, 57 S. Ct. 883, 109 A. L. R. 1293. The New York Unemployment Compensation Act was upheld by the New York Court of Appeals in W. H. H. Chamberlin, Inc., v. Andrews, 271 N. Y. 1, 2 N. E. (2d) 22, by a vote of five to two, and in the United States Supreme Court on appeal by an equally divided court, 299 U. S. 515, 81 L. Ed. 380, 57 S. Ct. 122. The Alabama Act was sustained in the same high court by a five to four vote. [Carmichael v. So. Coal & Coke Co., 301 U. S. 495, 81 L. Ed. 1245, 57 S. Ct. 868, 109 A. L. R. 1327.]

It is stated that such acts have now been passed in all the states of the Union, and in at least nine have been ruled constitutional in their fundamental and broader aspects. The legislation was inspired by the economic emergency which threatened this country early in the last decade, and was enacted to relieve the distress of unemployment. Essentially it was directed against industrial ills. Farm laborers, household domestics and a few other occupations were excepted from its operation. It is possible the acts would not have received legislative sanction if their burdens had been spread so widely. Nevertheless they reach the small employer in a rural environment if he has as many as eight employees, or has more than one business with employees in all aggregating that number. The instant case is concerned solely with this so-called "affiliate" or "common control" clause (h)4 and related provisions in the Missouri Act. And it seems the weight of authority during the last three years supports respondents' contention that constructive affiliation of separate businesses results alone from majority ownership *or* control by the same interests.

In U. C. C. v. City Ice & Coal Co., supra, 216 N. C. 6, 9, 3 S. E. (2d) 290-2, decided in June, 1939, there were three affiliated corporate enterprises whose capital stock was closely held by a family corporation. The latter directed and controlled them from its central office. The location and particular business of each of the three corporations is not disclosed by the opinion. The decision held the affiliate clause (like ours) "is clear in its intent to bring within the meaning of the

Act those separate corporate enterprises which have voluntarily waived the benefits of their separate identities by surrendering their control to a common management;'' and further, that the clause applies, ''when the inter-relationship existing between or among two or more business enterprises is such that a substantial unification of those enterprises (emanates) from a common source or fountain-head.'' As will be seen, this case was based on *actual* joint control. It was followed early the next year by Gibson Products Co., Inc., v. Murphy, 186 Okla. 714, 100 Pac. (2d) 453. The facts were substantially the same. The opinion declared on a six to two vote that ''maintenance of separate places of business and separate office facilities makes no valid distinction where both corporations as here are owned *and* controlled by the same interest.'' This case also was decided on actual common control.

But three months later in June, 1940, it was held in Fla. Indust. Comm. v. Gary-Lockhart Drug Co., Inc., 143 Fla. 293, 196 So. 845, by a four to two vote that four incorporated drug stores (location not shown) should be treated as one employer, for the *sole* reason that each had *two* stockholders whose several holdings in each company constituted a majority of its voting stock. And there was no evidence, so far as the decision discloses, that these two stockholders were collaborating. It was stipulated that all the corporations were existent prior to the passage of the law; that there was no evasion; and that they were separately operated without central management, bookkeeping, advertising or common trade name. Presumably, however, they were all in the same business. The North Carolina and Oklahoma cases were cited as authority.

A month later, in July, 1940, Indep. Gas. v. Bureau U. C., 190 Ga. 613, 10 S. E. (2d) 58, was decided, with certiorari denied by the United States Supreme Court, 311 U. S. 707, 85 L. Ed. 459, 61 S. Ct. 175. A single individual owned a majority of the stock in each of two family corporations, was active manager of both, and kept their books and records in his office. Neither alone had eight employees but together they did. One operated a gasoline filling station at Gainesville and the other a telephone exchange at Lexington about 50 miles distant in another county. This decision ruled that treating the two corporations as a single employing unit merely because the same person owned a majority of the stock in each, would deny both corporations severally equal protection of the law because their respective competitors similarly situated (but not linked with another business by common majority stock ownership) would be exempt from the Act.

The case further declared such a rule of constructive affiliation would prejudice the minority stockholders of both corporations by subjecting their interests to the payment of unemployment contributions, solely because of the *purely external and personal act* of an in-

dividual in acquiring stock control of both, which they were powerless to prevent, there being no evidence that this power had been exercised *within* the corporations to unify them. The decision further asserted that if such affiliation should occur the penalties resulting therefrom ought to be charged to the interest of the stockholder responsible therefor, and not be visited upon the innocent minority stockholders. This Georgia decision refused to follow the North Carolina and Oklahoma cases just reviewed. Two of the judges concurred in a separate opinion, holding the further facts should be considered, that the two corporations were in different counties and engaged in entirely different businesses, with the work required of one set of employees not of the same character as that required of the other.

In November, 1940, the Indiana Supreme Court followed the Georgia case, quoting from it at length, in Benner-Coryell Lbr. Co. v. Ind. U. C. Bd., 218 Ind. 20, 29 N. E. (2d) 776. There, the same individual was majority stockholder in each of two retail lumber corporations located in two towns about 20 miles apart in different counties. This decision further amplified the doctrine of the Georgia case, saying a corporation ordinarily has no control over the sale of its stock; that the stock control may shift repeatedly so that uncertainty and confusion would result; that if mere majority ownership of stock were the sole criterion, corporations remotely located and engaged in dissimilar business would arbitrarily and fictitiously be brought under the Compensation Act as one unit; and that, for instance, a corporation with only three employees would be subject thereto merely because an individual owner of 51% of its stock had a private business with six employees, or two such businesses with three each. The decision thereupon reached the conclusion that the phrase in the affiliate clause "controlled directly or indirectly by the same interests" should be carefully scrutinized; and it must be regarded as meaning "something more than that remote control" arising out of ownership of a majority of its voting stock.

In the same month, Maine U. C. C. v. Androscoggin, Jr., Inc., 137 Me. 154, 16 Atl. (2d) 252, followed the North Carolina and Oklahoma cases. Three causes apparently had been consolidated. In two of them a Mr. Healy individually owned and operated a camp for senior boys, called Camp Androscoggin. ▇▇▇ He also organized, was president, director and owned most of the capital stock of the captioned corporation, which conducted a camp for junior boys. The decision held this was evidence of actual control. The enterprises appear to have been neighboring but separate, and engaged in the same business except for the difference in the ages of the boys. In the other cause a Mr. Conquest owned his own home, two tenement houses (the latter called by the court a "real estate business") where he employed carpenters from time to time for repair work, one of whom cared for

the lawn. He was also a *minority* stockholder in three corporations selling automobiles and accessories. However, he actually controlled and formulated their policies. The court ruled all were under the Act; said the issue was one of actual control; and declared the affiliate clause did not require the separate employing units to be in the same business, but simply that they be owned *or* controlled by the same interests.

In May, 1941, another North Carolina case was decided, U. C. C. v. J. M. Willis B. & B. Shop, 219 N. C. 709, 15 S. E. (2d) 4, 8. There the same individual owned two barber and beauty shops and a third barber shop under a different name—all at different locations in Winston-Salem. The court sustained a Commission finding that the same business was carried on at all three under his ownership and control, and treated them as a single employer, as against the defendant's contention that his wife and brother respectively were the beneficial owners of two of the businesses. The decision refused to follow the Georgia and Indiana cases, and adhered to its own earlier Ice & Coal Co. case, supra, citing also the Oklahoma, Maine and Florida cases.

In July, 1941, New Haven Metal & Heating Sup. Co. v. Danaher, 128 Conn. 213, 21 Atl. (2d) 383, upheld the affiliate clause of the Connecticut Act on these facts. The plaintiff was a family corporation in the plumbing supply business and also had conducted a paint supply business in a different room in the same building, under another name. After the passage of the compensation act the family stockholders converted the paint business into a partnership at the same address and continued the former separate name. Thus there was ample evidence of joint control and some evidence of attempted evasion. The decision cites both North Carolina cases and the Oklahoma, Maine and Florida cases. It does not refer to the Georgia or Indiana cases.

In October, 1941, two decisions came out. The facts in State v. Kitsap County Bank, 10 Wash (2d) 520, 117 Pac. (2d) 228, were that one man owned a majority of the capital stock of a state banking corporation and of a national banking corporation in different towns in the same county. The decision is based on that fact alone, and held both should be treated as a single employer, following the second North Carolina case and the Connecticut case, supra, and rejecting the Georgia and Indiana cases, supra. Answering the Georgia case, the opinion said minority stockholders of a corporation frequently are injured one way or another through the action of the majority; and cannot complain if the corporation be brought within the law when the majority stockholder seeks to evade *his* legitimate tax obligation. Further answering the contention of the Indiana case that the word "control" in the affiliate clause means something more than mere ownership of a majority of the voting stock, this Washington

case said that construction would embarrass the administration of the compensation law.

The other decision was Miss. U. C. C. v. Avent (Miss.), 4 So. (2d) 296, where a man owned a drug store and a dairy in the same town, and controlled the employees of both. After the state compensation act was passed he conveyed the dairy to his wife. The opinion said it was not concerned with the validity of that conveyance if *control* still remained in the defendant; and on that point declared one fact to be considered was the "affinity" between the two businesses, as attested by common knowledge that the modern drug store caters to the inner man and outer woman.

There are two recent Texas cases. In Washington Oil Corp. v. State (Tex. Civ. App.), 159 S. W. (2d) 517, four oil corporations had common directors, officers and majority stock ownership, used the same offices, facilities, employees (in part), furnished loans to each other and employed common counsel. In Witherspoon Oil Co. v. State (Tex. Civ. App.), 156 S. W. (2d) 579, 583, both the majority stockholder in a corporation and the corporation itself were engaged in the oil business in the same offices, and the employees of the latter performed services for him. In both cases the conclusion was reached without dissent that the several employing units were under the Act.

One case in this State bears on the question, Murphy v. Doniphan Telephone Co., 347 Mo. 372, 147 S. W. (2d) 616, 620(9). There, D. A. Rice owned a majority of the voting stock and was president and general manager of the defendant telephone corporation in Ripley County, which had seven employees. He individually owned another telephone system in Wayne County with six employees. The Missouri Unemployment Compensation Commission sued the corporation in the circuit court for unemployment contributions on the theory that it was an "employer" with eight or more employees under subsection (h)4, because of Rice's controlling ownership of both telephone systems. Division 1 of this court affirmed a judgment below for defendant on the ground that the question at issue was *actual* joint control; and that while the above facts may have supported an *inference* of such control, yet, since the trial court had found to the contrary this court must treat the finding as a special verdict. As stated, the action had been brought directly in the circuit court. It was not a judicial review of a claim previously passed upon by the Commission; and hence the provision of Sec. 9432 (i), supra, that the Commission's findings of facts shall be conclusive if supported by competent evidence, was not applicable.

That provision does apply here. Respondents therefore contend we are bound by their finding that the Kellogg company and the Creel company should be treated as a single employing unit because appellant individually owned one and held a majority of the stock in

the other. Indeed they go further. Subsection (h)4 was amended by Laws Mo. 1941, pp. 566, 578, by the addition of a parenthetical clause: "(and for the purposes of this definition ownership by the same person of the majority of the voting shares of stock of an employing unit shall, among other things, constitute *prima facie* evidence of control by legally enforceable means)." Respondents assert this amendment also is applicable here (although passed after the trial below) because the Legislature thereby "showed its intent as to the meaning (in) the original statute of the phrase 'owned or controlled, directly or indirectly by legally enforceable means.'" Their ultimate contention is that the affiliate clause (h)4 makes ownership of a majority of the stock in a corporation prima facie evidence not only of actual control of that corporation, but also of *joint* control of that corporation along with any other business in the state owned or controlled by the same interests.

There can be no doubt that the ultimate criterion under subsection (h)1, 4, is *substantial unification* of two or more businesses by *actual joint control.* Thus the Ice & Coal Co. case from North Carolina (father of the doctrine and already quoted) construed an affiliate clause like ours as applying when the separate corporate enterprises "have voluntarily waived the benefits of their separate identities by surrendering their control to a common management;" and when "the inter-relationship existing . . . is such that a substantial unification of those enterprises (emanates) from a common source or fountain-head." So also the Avent case from Mississippi said it was immaterial whether the defendant owned both the drug store and dairy if he *controlled* them. The Androscoggin case from Maine was expressly based on actual control. Likewise in the Doniphan telephone case from Missouri actual joint control was treated as the focal point of the evidence. The same is implied in most of the other cases; and there was circumstantial evidence indicating common control, as that: the businesses were conducted on the same premises; or from the same office; or that there was a gratuitous exchange of services or a natural "affinity" between them. On the other hand the Oklahoma case held maintenance of separate places of business and office facilities was immaterial when actual common control was shown.

Furthermore, all of the foregoing cases that touch on the point say the affiliate clause was enacted to prevent *circumvention* of the law by splitting a business with the required number of employees into smaller units each with less than the minimum number. This implies a homogenious entity to be split up—a business which before the enactment, in circumstances otherwise similar, reasonably might have been carried on as a single unit. The Androscoggin case speculates the clause was aimed at "certain types of business, particularly those where labor costs represent a large part of the total expenses

of operation, and where efficiency would not be materially ▮ impaired by the division of the unit.'' In other words it seems fair to say the law is not intended to cover businesses of such diverse location and nature that there had been no substantial unification and normally would not be if the law had not been enacted—unless, of course, there is evidence indicating actual joint control. The same idea is borne out by the fact that subsection (g) defining an employing unit, provides that employees of any such unit maintaining *"two or more separate establishments* within this state,'' shall be deemed to be employed by a single employing unit, which signifies something of unity and service to a common purpose in the several establishments.

▮ And so we conclude that although subsection (h)4 in terms declares two or more separate employing units (with eight or more employees) shall be treated as a single unit if mainly owned *or* controlled by the same interests, yet the ownership mentioned is not of itself the test, but is intended to be merely evidentiary of actual common control. There really is little dispute about that. But most of the cases cited above treat the subsection as establishing a statutory *rule of prima facie evidence* which the courts must follow; or else they regard it as' a statutory *classification* of the businesses described and equally binding. The Georgia and Indiana decisions hold the rule or classification, whichever it be called, is too broad; that if followed literally it would in some circumstances deprive owners of due process and equal protection of the law; and they therefore give it a narrower construction to avoid unconstitutionality. This states the basic difference between the two lines of decisions as we understand them.

▮ Whether the affiliate clause (h)4 establishes a rule of evidence or classification, it cannot rest on a foundation which is so arbitrary, unreasonable, unnatural or extraordinary as to make it unconstitutional.[2] However, the burden is on the assailant of the statute to show it is arbitrary, when applied to him; and not on its proponent to show it is reasonable. In the Shelby case cited in the margin, a statute of this State provided (without any time limit) that the failure of a bank should be prima facie evidence of knowledge on the part of its officer receiving deposits that it was insolvent or in failing circumstances. Division 2 of this court held the statute was of doubtful constitutionality unless it be read as meaning that the bank failure must occur *recently* after the receipt of the deposit—soon enough to prevent the

[2] 4 Wigmore on Evidence (3 Ed.), sec. 1856, p. 724-5; 2 Cooley's Constitutional Limitations (8 Ed.), pp. 768-9; 12 C. J., sec. 855, p. 1130, sec. 857, p. 1133, sec. 868, p. 1139; 16 C. J. S., sec. 489, p. 954, sec. 493, p. 961, sec. 500d, p. 984; 12 Am. Jur., sec. 480, p. 147, secs. 624, 625, pp. 316, 317; State v. Shelby, 333 Mo. 1036, 1047, 64 S. W. (2d) 269, 273(11); O'Donnell v. Wells, 323 Mo. 1170, 1178, 21 S. W. (2d) 762, 766; Brown v. Curtin, 330 Mo. 1156, 1171, 52 S. W. (2d) 387, 393(9); Clem v. Evans (Tex.), 291 S. W. 871, 51 A. L. R. 1135, 1139, Annot.; Bandini Petroleum Co. v. Superior Ct., 284 U. S. 8, 76 L. Ed. 136, 52 S. Ct. 899, 78 A. L. R. 826; Powers v. State, 204 Ind. 472, 184 N. E. 549, 86 A. L. R. 166, 180, Annot.

statutory connection between the event and the imputed guilty knowledge from being unreasonable and arbitrary. Furthermore, we have the additional factor in this case that Sec. 9432(i) makes the Commission's findings of fact conclusive when supported by competent evidence, which in practical effect makes the rule conclusive, in view of respondents' theory that common majority ownership of two or more separate businesses in this State is competent and sufficient evidence of unified control regardless of any other facts proven.

 Some rules of presumption or prima facie evidence are *purely* procedural. They do not rest on a fact basis having substantial probative value, but merely shift the burden of evidence for reasons of judicial policy. With respect to certain of these it has been held in this State that a prima facie case founded solely thereon must fail if the adversary party adduces substantial controverting evidence which is not rebutted.[3] On the other hand if the basic facts underlying the presumption (alone or with other evidence) are strong enough to support the required inference independent of the presumption, the case does not fall before controverting evidence.[4] In either instance the presumption as such (being addressed to the judge, not to the jury or trier of facts) adds nothing to the weight of the evidence,[5] but passes out of the case when the evidence pro and con enters in.

 When the rule of evidence, or presumption, is statutory the courts cannot question the reasonableness or wisdom of the legislative policy prompting it unless it transcends legislative power.[6] But in our opinion a statutory rule *evidentially* is no stronger than a similar judicial rule; and cannot authorize the imposition of a liability or penalty, civil or criminal through the device of declaring certain facts shall be prima facie evidence of another decisive or incriminating fact—when the rule is wholly arbitrary, unreasonable, lacking in logical connection between the initial and imputed facts, and has been met by substantial controverting evidence. True, a rule of procedure or a police regulation may be established, but even the Legislature cannot by law make black white to the eyes of the *jury*

---

[3]Restatement, Evidence, Rule 704(2), Comment I A(2); Guthrie v. Holmes, 272 Mo. 215, 233-4, 198 S. W. 854, 858(1), Ann. Cas. 1918D, 1123; Bond v. St. L.-S. F. Ry. Co., 315 Mo. 987, 1001, 288 S. W. 777, 782(1); State ex rel. Arndt v. Cox, 327 Mo. 790, 801, 38 S. W. (2d) 1079, 1084(7); State ex rel. Dunklin Co. v. McKay, 330 Mo. 33, 41-2, 49 S. W. (2d) 125, 128(2); Liberty Natl. Bank v. Vanderslice-Lynds Co., 338 Mo. 932, 940, 95 S. W. (2d) 324, 327(1).

[4]Restatement, Evidence, Rule 704(2), Comment II A(2); Bond v. St. L.-S. F. Ry. Co., 315 Mo. l. c. 1002, 288 S. W. l. c. 782(3); State ex rel. Dunklin County v. McKay, 330 Mo. 33, 42, 49 S. W. (2d) 125, 128(2); Loehr v. Stark, 332 Mo. 131, 141(3), 144(4), 56 S. W. (2d) 772, 776(3), 777(5); State ex rel. Waters v. Hostetter, 344 Mo. 443, 447-8(2), 126 S. W. (2d) 1164, 1166(3).

[5]4 Wigmore on Evid. (3 Ed.), sec. 1356(a), p. 724; 9 id., sec. 2491(3), p. 290.

[6]4 Wigmore on Evid. (3 Ed.), sec. 1356(a), (b), pp. 724, 730-2.

or other trier of the facts. It is conceded everywhere that a presumption of fact cannot be made conclusive[7] except by entering the field of substantive law. It is our view that the effect is similar but in a lesser degree when the law *authorizes* a verdict or finding resting on pure fiction as against substantial evidence to the contrary. The jury *may* so find. Whether the statutory showing is fiction or not is a judicial question much like that constantly confronting courts in ordinary cases when they are required to determine whether evidence is sufficiently substantial to take the case to the jury.

On the classification theory respondents say: that statutory classifications made to prevent evasions of law are constitutional; and that tax legislation, particularly, need not be free from discrimination: citing the Connecticut and Washington cases and Purity Extract Co. v. Lynch, 226 U. S. 192, 201, 57 L. Ed. 184, 33 S. Ct. 44. This raises a question of substantive law. The two state cases sustain respondents' contention on the specific question involved here. We agree to the general doctrine but think it has limitations. The Purity Extract case sustained a state law prohibiting the sale of all malt beverages, to prevent the marketing of real or pretended intoxicating beer by subterfuge or fraud. A recent Missouri decision, Hann v. Fitzgerald, 342 Mo. 1166, 119 S. W. (2d) 808, upheld a statute with the same objective, forbidding a dealer in intoxicating beer from selling nonintoxicating beer on his premises on Sunday, which latter soft drink dealers could do. But, drawing a parallel with this case, if the law had further provided a liquor dealer owning or controlling a saloon in one town and a soft drink bar anywhere else in the state could not sell beer in the latter on Sunday, we apprehend the decision would have been different on that provision.

We agree proof of major ownership, or control, of two separate businesses (corporate or otherwise) by the same employing unit sometimes would be sufficient to make an inference of unified control not unreasonable or arbitrary. Sometimes it would be wholly insufficient, depending on the proven history, location and nature of the two businesses. Hence we are unable to approve respondents' broad and unrestricted formula that any two or more businesses anywhere in the State are prima facie brought under the Unemployment Compensation Act by the sole fact of common major ownership or control, regardless of any evidence to the contrary. Neither do we agree that the formula is warranted, as held in the case from Washington, because it would be more difficult to prove the fact of unified control or natural affinity between the several businesses than to prove common ownership. Under subsection (g) an employing unit may be either an individual or a partnership, corporation, association, trust, joint-stock company, ▪▪▪ receivership, state in trust, bankruptcy

[7]9 Wigmore on Evid. (3 Ed.), sec. 2492, p. 292, and authorities cited margin (a), p. 14.

1182

or probate, with one or more employees. Does it really simplify the issue to trace title through these various and complicated forms of ownership, especially where the title instrument is ambiguous or challenged? We think not.

 We hold the affiliate clause subsection (h)·4 should be construed to refer to businesses which by location, nature or common experience might not unreasonably be expected to operate under substantial unification in the absence of such a statute; and to those where there is evidence of actual unification. The Legislature also would have the right to make a classification on that basis. But it is our conclusion that the two businesses involved in this case come within that rule—a general printing business and a newpaper publishing business conducted at the same address and under common major ownership. This is true although they were and previously had been operated as separate entities. As in the Hann case, supra, 342 Mo. 1166, 119 S. W. (2d) 808, it was not necessary to prove they had been *doing* the forbidden act; but only that the facts proven and specified in the statute substantially facilitated it. We have taken a broad range in this opinion because of the way the case was submitted.

Judgment affirmed. All concur.