GEORGE WARING, Formerly Doing Business as the ST. LOUIS COUNTY BUS LINES, St. Louis County, Missouri, Appellant, v. CARL J. HENRY, ELMER JOHN KEITEL, SR., and HARRY P. DRISLER, Members of the UNEMPLOYMENT COMPENSATION COMMISSION OF MISSOURI.—No. 39737.—203 S. W. (2d) 470.

Division Two, April 21, 1947.

Motion for Rehearing or to Transfer to Banc Overruled, July 14, 1947.

*Edwin A. Smith* for appellant.

*Michael J. Carroll,* Chief Counsel, and *Charles F. Moseley,* Assistant Counsel, for respondents.

 BARRETT, C.—██ Upon the theory that George Waring, doing business as the St. Louis County Bus Lines, was an employer within the meaning of the affiliate clause Mo. R. S. A., Sec. 9423(h) (4) of the Unemployment Compensation Law the Commission assessed contributions and interest against him for the years 1937 to 1941 inclusive. On review the Circuit Court of Cole County found that the final decision of the Commission was supported by competent and substantial evidence and affirmed the award. Upon this appeal by Waring the sole question for determination is whether there is competent and substantial evidence in support of the Commission's finding of fact. Mo. R. S. A., Sec. 9432B(c); Kellogg v. Murphy, 349 Mo. 1165, 164 S. W. (2d) 285; Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S. W. (2d) 647.

██ Admittedly, since January 1942, George Waring has been subject to the act and, accordingly, has been paying contributions as an employer under the act. But it is the position of the Commission that he was also under the act from 1937 through 1941 because he owned, operated and controlled the St. Louis County Bus Line and, at the same time, was the majority stockholder of the Suburban Service Bus Company, the two businesses being managed and controlled by the same three persons, George Waring and his sons, Frank and Lee. In considering this case, therefore, we confine ourselves to the instance of two business units, one of which is a corporation, the majority stockholder of which is the sole owner of the other business. In so doing we eliminate from our consideration the instances which truly come under the successor clause of the act (Arado v. Keitel, (Mo.), 182 S. W. (2d) 176; Bucklin Coal Mining Co. v. Unemployment Comp. Com., No. 40,002, 356 Mo. 313, 201 S. W. (2d) 463) rather than those which come under the affiliate clause. See and compare the collection of cases in 142 A. L. R. 918 and 158 A. L. R. 1237.

The Commission examined but two witnesses, the appellant, George Waring, and its field adviser, Glenn S. Barrow. For twenty years Mr. Waring was employed by a retail hardware store. He testified that he was the sole owner, operator and manager of the St. Louis County Bus Line and that his sons, Frank and Lee, had no interest whatever in that enterprise. During the years 1937, 1938, 1939 and 1940 that bus line consisted of two, sometimes three, busses. That bus line is a single route running from Cherokee over Gravois to Hampton and Affton. The equipment of the St. Louis County Bus Line is kept and maintained in private garages, most of the time in a garage at Gravois and Rock Hill Road. Originally, one of the busses had been a school bus, one was purchased in Chicago and one was purchased from Suburban Service Bus Company and, at the time of the hearing, one bus had been leased on a month to month basis from Suburban Service Bus Company. Mr. Waring testified that

St. Louis County Bus Line operated under a permit from the City of St. Louis.

The Suburban Service Bus Company is a corporation with fifty shares of capital stock. Originally, Mr. Waring owned twenty-one shares of the stock and his sons, Frank and Lee, owned two shares each, while a Mr. Carron owned twenty-two shares of stock and Mrs. Carron owned two shares with one daughter and one share with another daughter. In 1935 Mr. Carron died and his stock was transferred to his wife. On June 15th, 1937 Mr. Waring bought the twenty-five shares of stock from Mrs. Carron and her daughters. Mr. Waring's sons, Frank and Lee, had been working for the company and on December 24, 1939, he gave each of them seven additional shares of stock in the company. On January 9th, 1940 he gave Lee an additional seven shares and in February 1940 Mr. Waring divided the stock so that he owned eighteen shares and each son owned sixteen shares. Throughout the time Mr. Waring and his sons have been the directors of the corporation. Mr. Waring has always been president and the sons secretary-treasurer or vice-president. At the time of the hearing Frank Waring was forty years of age and Lee was in his thirties.

The Suburban Service Bus Company operates twenty-two or twenty-three busses over both regular and irregular routes under permits from the Missouri Public Service Commission. The regular route is from 8200 N. Broadway to Riverview Drive to Prospect Hill, to Riverview Gardens and return. Another route is over Broadway to Spanish Lake and the St. Louis Training School. In addition the company has a contract with the City of St. Louis to transport waterworks employees to the Chain of Rocks. For a part of the time the company has transported workers to the Curtis-Wright plant.

The office of Suburban Service Bus Company is at 9300 Bellefontaine Road, sixteen miles from the garage where St. Louis County busses are kept. Mr. Waring testified that his son, Lee, did the office and book work for the company while Frank managed the garage and repair work. He testified that he took no part in the management or operation of that company. He said that company was managed and controlled by his two sons, Frank and Lee. When asked what his functions as president of the company were he said: "Very little—I don't function. I don't function up there—I don't have anything to do with it." He said: "I established this for the children."

The sons live in separate houses just west of the garage on Bellefontaine. Mr. Waring lives with Frank and uses the basement of Frank's home as an office from which he conducts the affairs of St. Louis County Bus Lines. He testified that he kept separate books and a separate bank account for his company. When asked whether the bank accounts of the two businesses were kept in the same bank,

he said: "I am not sure now whether they are both in the same bank or not but I know we put them together and I don't know whether they have been separated since or not—we had a little confusion in one bank so we moved one account to another bank but I don't know how they are doing that now—I don't pay any attention to it." He said that he did not pay any attention to Suburban Service Bus Company at all.

He did say that in the absence of his sons he occasionally signed checks for Suburban Service Bus Company and that in his absence his sons had authority to sign St. Louis County Bus Line checks. Though it is not entirely clear whether Suburban's office is also in the basement of Frank's home or in the garage at 9300 Bellefontaine, Mr. Waring did say that the books ▮▮▮ of both companies were kept in the same safe. He says he kept St. Louis County's books: "I try to keep them all myself until the final records are written up and we usually get someone to write them up but I do all of the detailed work." He said that Suburban had a typewriter up at the house but that both companies did not use it, a girl did Suburban's stenographic work. He thought, possibly, that she may have written an occasional letter for St. Louis County. Lee's wife filled out the tax reports now being sent to the Unemployment Compensation Commission. The Commission's field adviser testified that for a couple hours on July 19th, 1943, he made obeservations along St. Louis County's route and at Schubert's garage on Gravois. He saw at least one bus on the route lettered "Suburban Service Bus Company" which carried a sign "Affton." He also saw a bus lettered "Suburban" parked on the garage lot. Mr. Waring testified, however, that he had purchased one bus from Suburban and that he leased another from Suburban. It does not appear whether any of these latter matters transpired or were true from 1937 through 1941. As to whether St. Louis County used Suburban's busses Mr. Waring said: "I only know of one time in the last two years when we borrowed a bus from them." His explanation was that they did that only in an emergency. "Not unless something is broken down—sometimes we might have helped one another out the same as we would do with any other company. . . . We do that for all companies. We pick up for the East St. Louis lines on our trips out to Curtis-Wright—we do that with all companies—we help them out."

Unsatisfactory as this record is, there is competent and substantial evidence in support of the Commission's finding. Apparently available, enlightening testimony was not used. Certainly the status of the bank accounts and how they were handled could have been established with some degree of certainty. Some further light could have been shed upon the nature of the two businesses, the possibility and plausibility of their being combined and how they were in fact conducted and controlled. It could have been definitely established

whether they are both under the jurisdiction of the Public Service Commission. Murphy v. Doniphan Tel. Co., 347 Mo. 372, 376, 147 S. W. (2d) 616, 618. It is not for this court to say what testimony must or should be used and we merely point out that a more complete hearing would certainly have left this case free from doubt, one way or another. As a matter of fact, upon the present record, the case is closely analogous to State Unemployment Comp. Bd. v. Warrior Petroleum Co., 221 Ind. 180, 46 N. E. (2d) 827; Maryland Unemployment Comp. B. v. Albrecht, (Md.), 36 Atl. (2d) 666 and State v. Tulsa Flower Exchange (Okla.), 135 P. (2d) 46, compelling the inferences drawn in Murphy v. Doniphan Telephone Co., supra.

Nevertheless, there is substantial evidence in support of the Commission's finding within the meaning of what has justly become one of the leading cases in the United States, Kellogg v. Murphy, supra. In that case the two businesses were in fact conducted at the same address under common major ownership and there was also clear evidence of actual control of the two businesses by the majority stockholder of one business who was also the owner of the other business. In that case there was clearer evidence of "actual unification." The case holds that major ownership or control "of two separate businesses (corporate or otherwise) by the same employing unit sometimes would be sufficient to make an inference of unified control not unreasonable or arbitrary." But, "Sometimes it would be wholly insufficient, depending on the proven history, location and nature of the two businesses. . . . We hold the affiliate clause subsection (h) 4 should be construed to refer to businesses which by location, nature or common experience might not unreasonably be expected to operate under substantial unification in the absence of such a statute; and to those where there is evidence of actual unification."[1] Finally but fundamentally, "There can be no doubt that the ultimate criterion under subsection (h)1, 4, is *substantial unification* of two or more businesses by *actual joint control*." (349 Mo. l. c. 1178, 1181, 1182, 164 S. W. (2d) l. c. 292, 294, 295). The latter is the ultimate, conclusive test. Upon this record the test of actual control is a rather tenuous inference but has foundation in the majority ownership, the similar nature of the two businesses, the family relationship of the parties, the history of both businesses, the authority of Mr. Waring to write checks for both businesses, the use of the safe for both businesses and the manner in which St. Louis County's re-

---

[1]Of the forty-nine unemployment statutes only Missouri's contains the clause "and for the purposes of this definition ownership by the same person of the majority of the voting shares of stock of an employing unit shall, among other things, constitute prima facie evidence of control by legally enforceable means." Mo. R. S. A., Sec. 9423(h) 4. In two states and the District of Columbia affiliate clauses have no place in the acts. North Dakota has a rather unique provision. Twenty statutes contain plain affiliate clauses. Twenty-four states do not employ the affiliate clause at all.

ports were made and its books kept. Kellogg v. Murphy, supra; Trianon Hotel Co. v. Keitel, 350 Mo. 1041, 169 S. W. (2d) 891; Krisman v. Unemployment Comp. Com., 351 Mo. 18, 171 S. W. (2d) 575; Peerless Fixture Co. v. Keitel, 355 Mo. 144, 195 S. W. (2d) 449; Wood v. Wagner Electric Corp., supra. The Commission was not bound to accept the explanations (Atkisson v. Murphy, 352 Mo. 644, 649, 179 S. W. (2d) 27, 30) even though their rejection does not necessarily support some positive inference to the contrary. There is no evidence of evasion or circumvention but that is not the test in this jurisdiction (Iron Street Corp. v. Michigan U. Comp. Com., 305 Mich. 643, 9 N. W. (2d) 874) even though evidence of evasion might indicate control or unification. 158 A. L. R., l. c. 1237.

The appellant also contends that the judgment affirming the award deprives him of his property without due process of law within the meaning of the 5th and 14th amendments of the Constitution of the United States and Section 10, Article I of the Constitution of Missouri. He does not point out how or wherein the judgment infringes his constitutional rights (Krisman v. Unemployment Comp. Com., 351 Mo. l. c. 26, 171 S. W. (2d) l. c. 580) but, in any event, it has been definitely decided that the affiliate clause of the Unemployment Compensation Act is not unconstitutional in this respect, at least in the circumstances of this case. Kellogg v. Murphy, supra; Godsol v. Michigan Unemployment Comp. Com., 302 Mich. 652, 5 N. W. (2d) 519, 142 A. L. R. 910; annotation 158 A. L. R. 1237-1240.

The judgment is therefore affirmed. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.